UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| CNS INTERNATIONAL MINISTRIES, INC., | ) ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00065 |
| | ) | |
| ROBERT KNODELL, Acting Director of | ) | |
| the Missouri Department of Social | ) | |
| Services, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT
OF THE MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff CNS International Ministries, Inc., challenges the validity of House Bills 557 and 560 and the associated regulations promulgated by the Missouri Department of Social Services. Those laws require license-exempt residential care facilities to notify the Department of their operations and applicants to complete a background check. Defendant Robert Knodell, sued in his official capacity as Acting Director of the Missouri Department of Social Services, moves for judgment on the pleadings.

**I.      Facts**

Last year, the Missouri General Assembly passed House Bill Numbers 557 and 560. Exhibit A. Those bills amend chapter 210 of the Missouri Revised Statutes. Primarily at issue here are two new requirements related to license-exempt residential care facilities: notification that an organization operates a license-exempt residential care facility and background checks. A residential care facility is "any place, facility, or home operated by any person who receives children who are not related to the operator and whose parent or guardian is not a resident of the same facility and that provides such children with supervision, care, lodging, and maintenance for

1

twenty-four hours a day, with or without transfer of custody." Mo. Rev. Stat. § 210.1253(6). Section 210.516 exempts from licensure residential care facilities "operated by any well-known religious order or church." House Bills 557 and 560 authorize the Department of Social Services to promulgate rules implementing the new background check requirements. § 210.493.14.

Under that authority, the Department drafted emergency amendments to existing regulations. Emergency Amendments to 13 C.S.R. 35-71, 46 Mo. Reg. 1907, 1907 (November 1, 2021). It published them on its website, solicited comments through email, and held a public meeting on August 5, 2021. *Id.* Those amendments were filed September 17, 2021, became effective October 1, 2021, and expired March 29, 2022. *Id.*

The emergency rules mandated license-exempt residential care facilities (LERCFs) to register with the Department[1] no later than October 12, 2021. *Id.* at 1928 (13 C.S.R. 35-71.300)(4)). They provided LERCFs until December 31, 2021, to satisfy the background check requirements, with extensions available. *Id.* at 1911 (13 C.S.R. 35-71.015(4)(A)). The Department extended that deadline to March 31, 2022. The final rules, published on February 28, 2022, reflect that extension. 13 C.S.R. 35-71.015(4)(A); *see* Exhibit B (13 C.S.R. 35-71).

Plaintiff CNS International Ministries provides several commendable services to its members. It maintains a church as the heart of the community. *Id.* ¶ 24. It operates drug recovery programs for children, women, and men. Doc. 23 ¶¶ 9, 78. It runs a school for kindergarten through grade twelve and a two-year college. *Id.* It aspires to create a community that believes that Jesus is the answer to every issue individuals face. *Id.* ¶¶ 20–21. In pursuit of that goal, CNS located its boarding school, which qualifies as a LERCF, on the same "sprawling campus" as its drug

---

[1] The regulations use "division" and "department" to refer to the Children's Division of the Missouri Department of Social Services. 13 C.S.R. 35-71.010(2)(F). For uniformity, this motion uses "Department".

recovery programs. Doc. 23 ¶¶ 14, 40–41. CNS alleges that the background check requirements threaten the viability of its ministries, in effect forcing it to choose between the boarding school and the adult recovery programs.

CNS filed this case on October 12, 2021—the deadline to notify the Department that it was operating a LERCF in Missouri. It seeks declaratory and injunctive relief protecting it from enforcement of the notification and background check requirements as stated in H.B. 557 and 560 and the corresponding regulations. The deadline for amended pleadings was February 16, 2022. On March 16, 2022, CNS requested leave to file an amended complaint out of time, which the Court granted. The amended complaint added one count and substituted Defendant Acting Director Robert Knodell. CNS then stipulated to dismissal of its claims against Acting Director Knodell in his individual capacity. This case is currently set for trial on the March 2023 docket. As a result, this motion for judgment on the pleadings will not delay trial.

## II.      Legal Standard

"Judgment on the pleadings is appropriate when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law." *Country Preferred Ins. Co. v. Lee*, 918 F.3d 587, 588 (8th Cir. 2019), *citing Brinkley v. Pfizer, Inc.*, 772 F.3d 1133, 1137 (8th Cir. 2014). Rule 12(c) requires the Court to accept as true the factual allegations set forth in the complaint and to construe the complaint in favor of the non-moving party. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).

## III.      Argument

The amended complaint raises seven counts, touching on due process, religious liberty and other First Amendment interests, and Fourth Amendment concerns. Despite the variety of legal

theories, the claims are premised on a misunderstanding of the challenged laws. The Department explains the relevant provisions for each count.

CNS claims that the challenged laws provide inadequate process to protect CNS and its members from violations of different rights in Counts III, IV, and VII. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The "specific dictates of due process" depend on "three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The procedures must provide the "opportunity to be heard at a meaningful time and in a meaningful manner." *Mitchell v. Dakota Cnty. Social Servs.*, 959 F.3d 887, 898 (8th Cir. 2020) (quoting *Swipies v. Kofka*, 419 F.3d 709, 715 (8th Cir. 2005)). In many circumstances "postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997)).

The challenged laws provide administrative review, administrative appeal, and judicial review of the Department's decisions. When the Department relies on postdeprivation process, the postdeprivation hearing occurs promptly and consistent with the due process clause. Moreover, actions under the challenged laws do not threaten CNS's interests in the way it suggests. Therefore, these three counts should be dismissed. CNS seeks protection from the challenged laws in Count I on the theory that compliance forces CNS to violate its obligations under federal law. However, the challenged laws do not require CNS to disclose any records or information protected by federal law. For this reason, Count I should be dismissed.

In Count II, CNS claims that the challenged laws violate its right to freedom of association. But the challenged laws restrict employment and residence; they do not compel or prohibit membership in the association. Count II should be dismissed.

CNS alleges in Count VI that the Department cannot exercise its authority under § 210.1271 to seek a court order for the removal of children to enforce the challenged laws without running afoul of the Fourth Amendment's prohibition on unreasonable searches and seizures. Not so. The Department must have a court order to remove children under § 210.1271. Moreover, the challenged laws authorize, but do not direct, the Department to seek removal. It has discretion to enforce the challenged statutes, and its discretion is limited by the Fourth Amendment. Therefore, this pre-enforcement search and seizure claim must be dismissed.

In Count V, CNS seeks a declaration on an affirmative defense—the ministerial exception. Its claim fails for several reasons: the Court does not have subject matter jurisdiction to issue declaratory judgment on this affirmative defense; it should decline to issue a declaratory judgment on this count because doing so denies the Department its choice of forum; and CNS has not pleaded that any of its "sources of religious instruction" would be ineligible under the challenged laws to continue in their roles. Count V must be dismissed.

A. **Count III fails because the challenged laws provide sufficient process when they mandate two post-deprivation hearings within five days of the challenged agency action.**

The principal concern of Count III is the possibility of the removal of children in a way that violates due process. *See id.* ¶¶ 125–127, 129. That concern founders. While child custody is a legitimate interest, the challenged laws satisfy due process because they provide ample opportunity to be heard at a meaningful time in a meaningful manner. Due process does not require a pre-removal hearing. "In child removal cases, the meaningful time and manner requirement means that the state must hold a hearing *promptly after removal.*" *Mitchell*, 959 F.3d at 897

5

(emphasis added). The challenged laws provide sufficient protection against erroneous deprivation.

Section 210.1271 authorizes the Department to seek an injunction forcing a residential care facility, licensed or license-exempt, to cease operations in limited circumstances. Residential care facilities receive due process when they appear in court to oppose the injunction before any deprivation. The question is whether an *ex parte* order is ever permissible. Doc. 23 ¶¶ 124–25, 129–30. When the Department seeks an injunction in an *ex parte* hearing, additional requirements ensure adequate protection against erroneous deprivation for the residential care facilities and parents or guardians of the children involved. Namely, the court must hold a hearing within three business days of the *ex parte* order, and the Department must attempt to provide notice of the hearing to the parties, and it must provide "due process for all parties." § 210.1271.2.

While the statutory requirements for LERCFs are new, the court's authority to issue *ex parte* orders has withstood constitutional scrutiny. *Ex parte* orders to remove children from a facility do not offend due process if the removal is followed by "a prompt post-deprivation hearing." *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 815 (8th Cir. 2019). *See also In re M.D.S.*, 837 S.W.2d 338, 342 (Mo. Ct. App. 1991) (ex parte removal followed by notification "as soon as possible" was proper exercise of authority).

Evaluating the amount of process due is fact-intensive, but providing a hearing within three business days passes muster. *See Mitchell*, 959 F.3d at 898 (noting that plaintiffs "failed to allege or even identify the denial of a procedural safeguard" for post-deprivation hearing conducted ten days after removal); *Webb ex rel. K.S.*, 936 F.3d at 815 (declining to adopt 72-hour rule and reserving question whether hearing 11 days after removal violated due process). And in fact, the challenged laws go further. Within five days of removal, the court must order the children's return

to the facility or their parents unless it makes "specific, written findings" that return to the residential care facility "is contrary to the welfare of the child," "the parent or legal guardian is unable or unwilling to take physical custody of the child," and no other temporary placement is suitable. § 210.1271.4. Thus, the facility and the parents or guardians have a second opportunity to reverse the Department's decision.

For these reasons, the Court should dismiss Count III because the challenged laws provide sufficient due process.

**B. Count IV fails because the challenged laws do not interfere with religious schools' curriculum and parents are not compelled to send their children to public schools.**

CNS raises Count IV to assert generally parents' interests in directing the upbringing of their children.[2] CNS alleges that the background check requirements "conflict with these rights" because failure to comply with those requirements may end "with removals and ceased operations." Doc. 23 ¶ 137. The right to select a school is not plenary in the way CNS suggests, and the challenged laws do not impermissibly impede that right. As a result, the Court should dismiss Count IV.

CNS alleges that *Pierce v. Society of the Sisters* protects its "right to conduct schools in a certain manner." The Supreme Court has said otherwise: "*Meyer [v. Nebraska*, 262 U.S. 390 (1923),] and its progeny entitle [schools and parents] to no more" than the right to "inculcate whatever values and standards they deem desirable." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (collecting cases). The "limited scope of *Pierce* … affirmed the right of private schools to exist and to operate." *Id.* at 177 (quoting *Norwood v. Harrison*, 413 U.S. 455, 461, 462 (1973)). It

---

[2] *See* Doc. 23 ¶ 134 ("fair opportunity to procure for their children instruction"); ¶ 136 ("right to select where their children will be brought up and educated"); ¶ 138 (right to be "free from interference … to direct the upbringing and education of their children").

does not empower parents to nullify prohibitions on the residence of sex offenders, burglars, and felons who have committed drug-related offenses. *See* § 210.493.11 (enumerating disqualifying conduct and crimes). The challenged laws do not force CNS's members to send their children to public school, nor do they control what is taught. As a result, they do not run afoul of *Pierce*. *Id.*

The Supreme Court "has repeatedly stressed that … [parents] have no constitutional right to provide their children with private school education unfettered by reasonable government regulation." *Id.* at 178. The Eighth Circuit, following that rule, held that states can impose certification requirements on religious schools. *Fellowship Baptist Church v. Benton*, 815 F.2d 485 (8th Cir. 1987) (upholding basic reporting and licensure requirements). To reach that conclusion, the court rejected the plaintiffs' arguments that the state violated the due process because "licensure wrongfully interferes with a teacher's calling by God to teach." *Id.* at 493.

This Court should not allow CNS to avoid reasonable regulation, either. The Department has imposed a straightforward reporting requirement. *See* § 210.1262. The Department has provided an online portal for LERCFs to file all materials related to notification. Additionally, the Department has imposed a basic qualification for people who will work at LERCFs and adult residents of LERCFs: the ability to pass the background check. These requirements enable the Department to ensure that children at LERCFs are safe without giving the Department control over the curriculum that a religious school provides.

Because the challenged laws do not mandate public school attendance and do not interfere with curriculum, the Court should dismiss Count IV.

   C. **Count VII fails because applicants have an opportunity to correct or supplement the FBI background check information before the Department issues a final decision on their eligibility.**

CNS alleges that enforcing the challenged laws will violate CNS's rights to procedural due process under an additional theory. CNS styles Count VII a "Procedural Due Process/Federal

8

Supremacy" claim. In short, CNS believes that the Department violates due process rights of CNS and its members when it determines an applicant to be ineligible for employment or presence at the LERCF because the Department makes that determination through a process that conflicts with the FBI's identification records exchange policy. *See, e.g.*, Doc. 23 ¶ 165–67 (quoting 28 C.F.R. § 50.12); *see also* 13 C.S.R. 35-71.015(1)(A) (defining "applicant"). This count melds two separate theories: a violation of due process and a claim that the records exchange policy nullifies the background check requirements because of the Supremacy Clause, U.S. Const. art. VI, ¶ 2. The amended complaint fails to state a claim under either theory fails for at least three reasons.

*First*, the records exchange policy, 28 C.F.R. §50.12, does not grant a private right of action. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)). The statutes authorizing the records exchange policy do not create any right of action, so the policy cannot authorize private rights of action for enforcement. *See, e.g.*, 28 U.S.C. § 534; *see also Lott v. City of Lubbock*, 184 F.3d 819, (5th Cir. 1999) (unpublished per curiam) (noting that plaintiff did not contest district court's reasoning that 28 C.F.R. § 50.12 "creates no private right of action"). Because there is no private right of action, the Court should dismiss Count VII.

*Second*, Count VII fails because the challenged laws sufficiently protect CNS's members from the harm it incorrectly predicts. CNS alleges that the Department disqualifies applicants based on their background check without hearing challenges to the veracity of the facts underlying the ineligibility determination. Doc. 23 ¶¶ 164, 167. CNS asserts that this process conflicts with federal law, which "requires pre-deprivation due process regarding FBI background checks." *Id.* ¶ 165. CNS rests its claim on this phrase from the records exchange policy: "Officials making such determinations should not deny the license or employment based on information in the record until

the applicant has been afforded a reasonable time to correct or complete the record, or has declined to do so." *See* Doc. 23 ¶ 165 (quoting 28 C.F.R. § 50.12).

However, that provision does not nullify the Department's regulations because it expresses a preference, not a mandate. This is apparent by the language of the policy, which states that officials "*should* not deny" employment based on information in the record without allowing an opportunity to correct or supplement. 28 C.F.R. § 50.12. In contrast, the policy elsewhere states that officials relying on identification records "*must* notify individuals fingerprinted" of the FBI criminal history records check. *Id.* The FBI recognizes that some circumstances necessitate denying employment until factual challenges are resolved, which is why its position is stated as a preference and not a mandate.

*Third*, whether or not the records exchange policy creates a liberty interest, the challenged laws adhere to the FBI's policy. 28 C.F.R. § 50.12 provides that

> The officials making the determination of suitability for licensing or employment shall provide the applicants the opportunity to complete, or challenge the accuracy of, the information contained in the FBI identification record.

The Department requires applicants to submit certain information and allows them to submit "[a]ny other information and documents that the applicant wishes the division to consider in making its decision about eligibility." 13 C.S.R. 35-71.015(6)(B)(13). After a complete application is submitted, the Department determines eligibility.

That decision is not immediately final, and thus the applicant is not immediately precluded from employment. "[T]he applicant or person who is aggrieved by a decision of the division" has fourteen days from the mailing of the decision to request administrative review if the requestor believes that the decision is based on erroneous or incomplete information. 13 C.S.R. 35-71.015(12)(A). When requesting review, the requestor includes "the specific reasons the requestor believes the division's decision is erroneous" and "copies of any relevant documents, materials, or

10

information that the requestor wishes to submit in support of the administrative review request."
13 C.S.R. 35-71.015(12)(B)(1). To that, the regulations add the option to request a hearing. *Id.*

The Department designates an individual with no involvement in the underlying decision
to conduct administrative review. 13 C.S.R. 35-71.015(B)(6). That individual must review the
matter and issue a decision within 30 days from the date the Department received the request for
administrative review. 13 C.S.R. 35-71.015(12)(B)(7). That decision is final "as to any person that
is not an applicant." 13 C.S.R. 35-71.015(12)(B)(8). Through this process, the requestor has ample
opportunity to provide materials correcting or supplementing the record.

An applicant dissatisfied by administrative review has yet another opportunity to challenge
the decision: administrative appeal. 13 C.S.R. 35-71.015(12)(C). The regulations list what
"evidence shall be admitted and considered." 13 C.S.R. 35-71.015(12)(C)(4). The list includes a
"copy of the record of the court establishing that the applicant pled guilty or *nolo contendere* or
has been found guilty of a crime or offense listed in 210.493 RSMo." *Id.* If the applicant is listed
as a perpetrator of child abuse or neglect in a government registry, a "letter or official
communication from the applicable … government agency" must also be provided. *Id.* Although
the validity of these documents cannot be collaterally attacked, 13 C.S.R. 35-71.015(12)(C)(8),
the hearing officer considers them in context of the record and the written submissions from the
parties when it issues its decision. "The decision of the hearing officer shall be the final decision
of the department."[3] 13 C.S.R. 35-71.015(12)(C)(3). At this point, the Department can preclude
an applicant from employment with a LERCF.

---

[3] The administrative decision is final at this point, but applicants can seek judicial review for
further relief. 13 C.S.R. 35-71.015(12)(D). Under section 536.150, which governs judicial review,
the circuit court treats the case as an original action. *Furlong Cos., Inc. v. City of Kan. City*, 189
S.W.3d 157, 165 (Mo. banc 2006). It "hears evidence, determines facts, and adjudges the validity
of the agency decision." *Id.*

In short, applicants who disagree with the initial determination have two opportunities to challenge it at the administrative level. First, they can offer evidence to dispute underlying facts of the background checks. At the administrative appeal stage, they are confined to the record of the administrative review. The decision on eligibility is not final until after the second level of review. Thus the regulation complies with the FBI's preference that officials "should not deny the license or employment based on information in the record until the applicant has been afforded a reasonable time to correct or complete the record, or has declined to do so." 28 C.F.R. § 50.12.

This Court should conclude that the Department's process protects any interests created by the records exchange policy and dismiss Count VII.

If Count VII survives this motion, the Court should still limit it to CNS members who must undergo the FBI background check. Count VII centers on the Department denying applicants employment based on FBI background checks. *See* Doc. 23 ¶¶ 166–67. But not all people "engaged in the activities of Plaintiff's association" are members seeking employment, and not all applicants are subjected to the FBI background check. Doc. 23 ¶ 167. The Court should dismiss people who are not CNS members and people who are not subject to the FBI background check.

The General Assembly authorized the Department to use specific tools for background checks, § 210.493.3, and to specify the background checks necessary for applicants to complete, § 210.493.2. It did not mandate that the Department use all tools for all applicants. The Department promulgated rules that specify which tools the Department will use. *Compare* 13 C.S.R. 35-71.015(2) *with* § 210.493.3. In doing so, it recognized two groups of applicants and imposes different background check requirements on each. 13 C.S.R. 35-71.015(3)(A)-(B). Applicants of the first group are subject to state and FBI background checks. 13 C.S.R. 35-71.015(3)(A). A person "who is eighteen years of age or older, who resides at or on the property, or who has or

12

may have unsupervised access to children" at the LERCF but "is not an employee, volunteer, contractor, or owner/operator" falls into the second group. 13 C.S.R. 35-71.015(3)(B). Those applicants are submitted only to a state open records check. *Id.* Because no FBI background check is included, the records exchange policy must not apply to background checks on applicants in the second group. Those applicants should be dismissed from Count VII.

**D. Count I fails because the challenged laws do not compel disclosure of records or information protected by the cited federal laws.**

In Count I, CNS complains that it must violate federal privacy law to comply with the challenged laws because they require disclosure of federally protected patient records. CNS alleges that its drug recovery programs fall within the auspices of certain federal provision cited in the amended complaint. Doc. 23 ¶ 79. As a result, it cannot disclose "[r]ecords of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to" certain drug recovery programs. 42 U.S.C. § 290dd-2. Because CNS operates a LERCF, Doc. 23 ¶¶ 40–41, it must comply with the notification requirements in § 210.1262. CNS takes issue with the requirement to provide the "[n]ame of the director, owner, operator, all staff members, volunteers, and any individual eighteen years of age or older who resides at or on the property of the residential care facility." § 210.1262(2); *see also* Doc. 23 ¶ 83. CNS misunderstands the notification requirements.

Section 210.1262 does not does not violate 42 U.S.C. § 290dd-2 because it does not require CNS to identify its patients. Notification does not require submission of any records maintained in connection with a drug recovery program. Nor does notification require CNS to create any record that would disclose the identity, diagnosis, prognosis, or treatment of any patient. Instead, it requires only the name of the director, owner, operator, staff members, volunteers, and residents over eighteen years old. § 210.1262(2). To be sure, if CNS is housing patients at their boarding

school, it will have to provide their name as a resident of the residential care facility. Likewise, a

patient who serves as a director, owner, operator, staff member, or volunteer should be named. But

in no case is CNS required to identify any individual as a patient.

Because CNS can comply with the notification requirements without providing patient

records or otherwise labeling any individual as a patient, the Court should dismiss Count I.

E. **Count II fails because the freedom to associate does not license people with criminal histories to reside at or on the property of a children's residential care facility and the challenged laws do not affect membership.**

Count II fails because CNS does not allege that the challenged laws compel it to accept

members that it wishes to exclude, and, in fact, those laws do not. The First Amendment includes

the "right to associate for the purposes of speaking, which [the Supreme Court has] termed a 'right

of expressive association.'" *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68

(2006) [hereinafter *FAIR*]. "The right to expressive association protects groups from being forced

'to accept members [they do] not desire.'" *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760

(8th Cir. 2019) (quoting *FAIR*, 547 U.S. at 69). The challenged laws limit only whether people can

work, reside at or on the property of a residential care facility, or have unsupervised access to

children. 13 C.S.R. 35-71.015(3)(B). They exert no control over CNS membership.

To the extent Count II is a "disguised free-speech claim," *Telescope Media*, 936 F.3d at

760, it fails. The challenge laws do not affect CNS's ability to communicate any message. CNS

alleges that the challenged laws "restrict the freedom of CNSIMI to form an expressive association

of those who share a common commitment to education, addiction recovery and religious faith."

Doc. 23 ¶ 25. Count II does not specify what message CNS's members wish to speak. *See FAIR*,

547 U.S. at 68. Perhaps the intended message is that "Jesus is the answer to every issue individuals

face," Doc. 23 ¶ 21, or that "the church is the foundation of [CNS's] community and that

everything it does should have the church as its central purpose," Doc. 23 ¶ 27. But the challenged

laws do not impede either of these messages, or any other message CNS may be communicating, by prohibiting people with criminal backgrounds from living at or on the property of a children's residential care facility.

Similarly, if the Court casts Count II as a religious practice claim, Count II still fails because the challenged laws do not burden any of the religious beliefs CNS has alleged. For example, the challenged laws do not prohibit the men and women in the recovery programs from attending daily devotions, chapel, or weekly services at church. Doc. 23 ¶¶ 15, 17. The challenged laws simply restrict who can work or reside at or on the property of a residential care facility.

Because the challenged laws do not touch on CNS or its members' ability to associate for a constitutionally protected purpose, the Court must dismiss Count II.

**F. Count VI fails because the Department can enforce the challenged laws without violating the Fourth Amendment rights of CNS or its members.**

CNS asserts that the Department "promises" to violate its Fourth Amendment right to be free from warrantless and unreasonable searches and seizures. Doc. 23 ¶ 155. The Court must dismiss Count VI for at least two reasons. *First*, the Department has made no "promises" to CNS to violate the rights of CNS or its members. The amended complaint is devoid of allegations concerning any communications with the Department about the challenged laws. *Second*, the challenged laws do not require a search or seizure of children from CNS, so they make no "promise" to violate constitutional rights. CNS alleges that refusals to comply with the notification requirements "are punished by" an injunction to cease operations and removal of children. Doc. 23 ¶ 45 (citing § 210.1271). But that is not what the statute says. Rather, "the department … *may seek injunctive relief*" but is not required to do so. § 210.1271 (emphasis added).

Abiding by that authorization, the Department stated in the regulations that it will respond to reports or reasonable suspicion of a failure to notify by providing the LERCF with "written

15

notice by certified mail that the director shall file notification in accordance with the RCFNA and the division's implementing regulations, or the department may request a court injunction as provided under § 210.1271, or take other action as may be authorized by law." 13 C.S.R. 35-71.300(7). Thus, the regulations do not bind or otherwise "promise" to take action violative of the Fourth Amendment, either. For these reasons, the Court should deny Count VI.

G. **Count V fails because federal court is not the proper forum and this is not the proper time to consider CNS's claim that the ministerial exception excuses it from complying with the regulations.**

CNS alleges in Count V that the new background check requirements violate its "freedom and autonomy under the Religion Clauses of the First Amendment of the United States Constitution." Doc. 23 ¶ 141. In essence, CNS believes that the ministerial exception protects it from the background check requirements set forth in the challenged laws. *See id.* ¶ 144 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012)). For example, CNS alleges that the requirements undermine its ability to hire "teachers, house parents and the many other employees of Heartland who promote its message." *Id.* ¶ 144. CNS's claim fails for at least three reasons.

*First*, the Court lacks subject matter jurisdiction to issue a declaratory judgment on Count V. CNS alleges that this Court has federal question jurisdiction under 28 U.S.C. § 1331. Doc. 23 ¶ 6. "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

The Declaratory Judgment Act does not "open a new portal of entry to federal courts for suits that are essentially defensive or reactive to state actions." *Int'l Ass'n of Entrepreneurs of Am. v. Angoff*, 58 F.3d 1266, 1270 (8th Cir. 1995). To determine federal question jurisdiction for

declaratory judgment actions, courts "realign the parties to reflect the actual controversy underlying the action." *BASF Corp. v. Symington*, 50 F.3d 555, 555 (8th Cir. 1995) (citing *Public Serv. Comm'n v. Wycoff Cnty.*, 344 U.S. 237, 248 (1952)).

The ministerial exception is an affirmative defense, not a cause of action. *See Hosanna-Tabor*, 565 U.S. at 195 n.4. If the Department sued to enforce the challenged laws, its claims would be state law claims, and its petition would not present a federal question. As a result, this Court does not have federal question jurisdiction over the actual controversy. This Court should accordingly find that CNS's request for a declaratory judgment on its defenses are an improper attempt to "open a new portal of entry to federal courts" and hold that it lacks subject matter jurisdiction to issue a declaratory judgment on CNS's defenses. *Angoff*, 58 F.3d at 1270.

*Second* and alternatively, if the Court determines that it has federal question jurisdiction, prudential considerations weigh against deciding defenses against enforcement of the challenged laws. Denying a declaration on CNS's defenses guards against forum shopping when a declaratory plaintiff asserts a federal defense to a state law claim. *Symington*, 50 F.3d at 558. "[W]here a declaratory plaintiff raises chiefly an affirmative defense, and it appears that granting relief could effectively deny an allegedly injury party its otherwise legitimate choice of the forum and time for suit, no declaratory judgment should issue." *Id.* at 559. The Department may seek injunctive relief through state court proceedings to enforce the challenged laws. § 210.1271. Issuing a declaratory judgment on CNS's defenses would deny the Department its preferred forum for its claims.

*Third*, the complaint does not allege any facts supporting a determination that a minister would be ineligible because of his or her background check. The ministerial exception "ensures that the authority to select and control who will minister to the faithful … is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194–95. CNS allegedly selects its "teachers of religion" and "other

17

employees" to provide "religious instruction to students" necessary to "transmit[] religious faith to the next generation." Doc. 23 ¶ 143; *see also Hosanna-Tabor*, 565 U.S. at 192. However, there is no factual support in the complaint suggesting that the Department would conclude that any ministerial employee is ineligible. As a result, the background check requirement does not threaten CNS's "authority to select and control who will minister to the faithful." *Hosanna-Tabor*, 565 U.S. at 194–95.

Presumably, the group of people most likely to be ineligible for employment or presence at CNS's children's residential care facility is those in CNS's drug recovery program. *See, e.g.*, Doc. 23 ¶ 109 ("… the background check and eligibility requirements threaten the viability of CNSIMI's Recovery Program."). CNS alleges that "these individuals are ineligible to remain at CNSIMI regardless of whether they have any contact with children." Doc. 23 ¶ 108. But people who have no contact with the children are not providing religious instruction to those children. It follows, then, that the ministerial exception does not protect them.

For these reasons, Count V must be dismissed.

## IV.   Conclusion

The Department moves for judgment on the pleadings consistent with the arguments above.

Respectfully submitted,

**ERIC S. SCHMITT**
Attorney General

/s/ *Kaleb D. Gregory*
Kaleb D. Gregory, Missouri Bar 72821
       *Assistant Solicitor General*
815 Olive Street, Suite 200
St. Louis, MO  63101
(314) 340-7846
(573) 751-0774 (facsimile)
Kaleb.Gregory@ago.mo.gov
*Attorney for Defendant*

**CERTIFIATE OF SERVICE**

I hereby certify that on the 13th day of April, 2022, the foregoing was filed and served

via the Court's electronic filing system upon all counsel of record.


/s/ *Kaleb D. Gregory*
Kaleb D. Gregory
*Assistant Solicitor General*