IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

CNS INTERNATIONAL MINISTRIES, INC.,            )
                                                )
            Plaintiff,                          )
                                                )
v.                                              )        Case No. 2:21-CV-65 RLW
                                                )
ROBERT KNODELL, Acting Director of the         )
Missouri Department of Social Services,         )
                                                )
            Defendant.                          )

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ….......................................................................... ii

INTRODUCTION ......................................................................................... 1

FACTUAL BACKGROUND ……………………………………………………… 3

ARGUMENT ……………………………………………………………………… 15

    Summary Judgment Standard, Injunctive Relief Standard, and Burden of Proof……… 15

I.    Plaintiff is entitled to summary judgment on its claim that the State's new disclosure laws violate federal privacy laws (Count I). ……………………… 17

II.    Plaintiff is entitled to summary judgment on its claim that the State's new background check and disclosure laws violate Plaintiff's right to expressive association (Count II).……………………………………………………… 20

III.    Plaintiff is entitled to summary judgment on its claim that the State's new background check laws and child removal provisions violate Plaintiff's procedural due process rights (Count III). ………………………………………… 26

IV.    Plaintiff is entitled to summary judgment on its claim that the State's new background check laws and child removal provisions violate parental rights laws laid out in *Pierce v. Society of Sisters* (Count IV). ………………………… 31

V.    Plaintiff is entitled to summary judgment on its claim that the State's new background check laws and related employment disqualification rules violate Heartland's right to autonomy under *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (Count V).………………………………………… 33

VI.    Plaintiff is entitled to summary judgment on its claim that the State's new child removal and medical record laws and violate Heartland's Fourth Amendment rights (Count VI).………………………………………………………… 36

VII.    Plaintiff is entitled to summary judgment on its claim that the State's new background check laws violate procedural due process rights as demonstrated in similar federal laws (Count VII).………………………………………… 37

VIII.    Plaintiff Satisfies the Remaining Factors for a Permanent Injunction. ………… 39

CONCLUSION ……………………………………………………………………… 40

Certificate of Service ……………………………………………………………… 41

# TABLE OF AUTHORITIES

———————————

Page(s)

Cases

*ACLU v. Ashcroft,*
  322 F.3d 240 (3d Cir. 2003).................................................................................40

*Americans for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021).....................................................................................22

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...................................................................................15, 16

*Ass'n of Cmty. Organizations for Reform Now v. City of Frontenac,*
  714 F.2d 813 (8th Cir. 1983) ...........................................................................17

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)........................................................................................37

*Bryant v. Woodall,*
  1 F.4th 280 (4th Cir. 2021), as amended........................................................37

*Cannata v. Catholic Diocese of Austin,*
  700 F.3d 169 (5th Cir. 2012) ...........................................................................34

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).........................................................................................15

*City of Boerne v. Flores,*
  521 U.S. 507 (1997).........................................................................................26

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984).........................................................................................17

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church,*
  634 F.3d 1005 (8th Cir. 2011) ....................................................................16, 39

*Edenfield v. Fane,*
  507 U.S. 761 (1993).........................................................................................17

*Ellison v. Cocke Cty. Tenn,*
  63 F.3d 467 (6th Cir. 1995) ........................................................................19, 21

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................................16, 39

*Ginalski v. Diocese of Gary*,
2016 WL 7100558 (Dec. 5, 2016) ..................................................................................34

*Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005)........................................................................................................20

*Hartnagel v. Norman*,
953 F.2d 394 (8th Cir. 1992) ..........................................................................................15

*Heartland Acad. Cmty. Church v. Waddle*,
427 F.3d 525 (8th Cir. 2005) ....................................................................................24, 26

*Heartland Academy Community Church v. Waddle*,
317 F. Supp. 2d 984 (E.D. Mo. 2004)........................................................................28, 32

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013)............................................................................................37

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981)........................................................................................................17

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
565 U.S. 171 (2012)..............................................................................................2, 33, 34

*In re B.S.*,
659 F.2d 1137 (Vt. 1995)................................................................................................19

*Jamison v. Dept. of Soc. Servs.*,
218 S.W.3d 399 (Mo. 2007) ...........................................................................................29

*Little v. Wuerl*,
929 F.2d 944 (3d Cir. 1991)............................................................................................34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................................................16

*McConnell v. FEC*,
540 U.S. 93 (2003)..........................................................................................................17

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)........................................................................................................37

*NAACP v. Ala. ex rel. Patterson*,
　357 U.S. 449 (1958) ...................................................................................................... 20

*New Hampshire Right to Life Political Action Comm. v. Gardner*,
　99 F.3d 8 (1st Cir. 1996) ............................................................................................... 37

*NLRB v. Catholic Bishop of Chicago*,
　440 U.S. 490 (1979) ...................................................................................................... 34

*Org. for a Better Austin v. Keefe*,
　402 U.S. 415 (1971) ...................................................................................................... 17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
　140 S. Ct. 2049 (2020) .................................................................................................... 2

*Palesch v. Missouri Comm'n on Human Rights*,
　233 F.3d 560 (8th Cir. 2000) ......................................................................................... 16

*Perry Ed. Assn. v. Perry Local Ed. Assn.*,
　460 U.S. 37 (1983) ........................................................................................................ 16

*Pierce v. Society of Sisters*,
　268 U.S. 510 (1925) ........................................................................................... 31, 32, 33

*Roberts v. U.S. Jaycees*,
　468 U.S. 609 (1984) .................................................................................... 20, 21, 22, 26

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
　547 U.S. 47 (2006) ........................................................................................................ 21

*Stanback v. Best Diversified Prods., Inc.*,
　180 F.3d 903 (8th Cir. 1999) ......................................................................................... 16

*Susan B. Anthony List v. Driehaus*,
　573 U.S. 149 (2014) ...................................................................................................... 37

*U.S. ex. rel Chandler v. Cook Cty., Ill.*,
　277 F.3d 969 (7th Cir. 2002) .................................................................................... 19, 21

*U.S. v. Playboy Entm't Grp.*,
　529 U.S. 803 (2000) ...................................................................................................... 17

*United States v. Cresta*,
　825 F.2d 538 (1st Cir. 1987) ......................................................................................... 19

*Van Horn v. Best Buy Stores*,
   526 F.3d 1144 (8th Cir. 2008) .................................................................... 16

*Vermont Right to Life Comm., Inc. v. Sorrell*,
   221 F.3d 376 (2d Cir. 2000) ...................................................................... 37

*Webb v. Lawrence County*,
   144 F.3d 1131 (8th Cir. 1998) .................................................................. 16

*Whyte v. Connecticut Mutual Life Ins. Co.*,
   818 F.2d 1005 (1st Cir. 1987) ................................................................... 19

## Statutes

34 U.S.C. 40102 ............................................................................................. 38

42 U.S.C. 290dd-2 ....................................................................... 3, 17, 18, 20

42 U.S.C. 290ee-3 ........................................................................... 3, 17,19

42 U.S.C. 1320d ........................................................................................... 20

210.143, RSMo ........................................................................ 13, 14, 27, 28

210.258, RSMo ............................................................................................... 1

210.493, RSMo ................................................................................... Passim

210.900, RSMo ............................................................................................... 7

210.1253, RSMo ........................................................................................ 8, 9

210.1263, RSMo .......................................................................... 10, 23, 35

210.1264, RSMo ........................................................................................... 36

210.1268, RSMo .................................................................................... 10, 26

210.1271, RSMo .................................................... 10, 18, 26, 28, 37

210.1283, RSMo .......................................................... 11, 20, 23, 38

536.150, RSMo .................................................................................... 14, 31

Section 501 of the Internal Revenue Code ................................................ 4

U.S. Const. Art. VI, cl. 2 ................................................................................................39

Federal Regulations

28 CFR 50.12 ...............................................................................................31, 38

42 CFR 2.11 ........................................................................................................17

42 CFR 2.12 ..................................................................................................17, 18

42 CFR 2.13 ........................................................................................................18

42 CFR 2.20 ........................................................................................................19

Other Authorities

*Confidentiality of Alcohol and Other Drug Abuse Treatment Information for Emergency Department and Trauma Center Patients*, 20 Health Matrix 387 (2010) .................................................................................19

Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373 (1981) ...............................................................................35

## <u>INTRODUCTION</u>

Heartland (or CNSIMI[1]) is an intentional Christian community comprising multiple ministries dedicated to a specific interest or goal, similar to a religious order, a retirement community, or an artist colony. Heartland's particular mission is to communicate Jesus as the answer to every issue human persons face, including addiction, anger, broken homes, and financial crises. Heartland's recovery programs promote healing in children and adults who have been bound by life-controlling addictions, attitudes, and behavioral problems, by formation in the concepts of Christian living and personal responsibility. Heartland's other ministries complement its recovery programs by providing community and/or employment to carefully selected partners in Heartland's mission, many of whom are themselves living out a path of recovery and redemption.

New regulations of the State of Missouri strike at two essential freedoms guaranteed to Heartland by the First Amendment of the United States Constitution: church/religious organization autonomy and expressive association. In order to define and implement its mission, Heartland, like all religious organizations, has absolute autonomy in its selection of leaders and ministers. Similarly fundamental to its mission, as an expressive association, Heartland has a constitutionally protected right to choose the members of its own community. Both of these rights are central to a Christian expressive association's ability to pursue its designated mission; the State may not interfere with Heartland's right to define itself in either of these ways.[2]

---

[1] CNS International Ministries, Inc. (CNSIMI) is the corporate identity of Heartland, which comprises, among other things, Heartland Children and Youth Home (composed of separate recovery programs for girls and boys), Heartland Women's Recovery Program, and Heartland Men's Recovery Program and a K-12 religious school. *See infra* Factual Background, Part B, pp. 4-5.

[2] Earlier Missouri lawmakers deferred to these rights in <u>Section 210.258 RSMo.</u> (still valid but contradicted by the challenged new regulations): [*continued on next page*]

Nevertheless, on July 14, 2021, Missouri House Bills 557 and 560 took effect, imposing various new background check and disclosure provisions on "License-Exempt Residential Care Facilities" or "LERCFs"—a category that includes boarding schools, and therefore includes CNSIMI/Heartland.[3] The new laws' broad application to Heartland has obvious and immediate implications that range from flatly illegal to genuinely absurd.

Firstly, the laws purport to impose FBI background checks with automatic disqualification criteria on all associates of CNSIMI, including pastors and religious teachers. This is a straightforward violation of the longstanding church autonomy doctrine that reserves for religious organizations the exclusive right to choose their ministers. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).

Absurdly, the same searching FBI background checks must be conducted on everyone associated with CNSIMI in any way, including "support staff" who perform "professional services" or otherwise have no presence at CNSIMI, let alone contact with children. 13 CSR 35-71.015.

Troublingly, the State has already applied its new laws to exclude from Heartland a

---

Nothing in sections 210.252 to 210.257 shall be construed to authorize the department of health and senior services or any other governmental entity:

 . . .

(2)  To interfere with the selection, certification, minimal formal educational degree requirements, supervision or terms of employment of a facility's personnel;

(3)  To interfere with the selection of individuals sitting on any governing board of a child care facility;

(4)  To interfere with the selection of children enrolled in a child care facility . . ."

[3] Because CNSIMI includes a boarding school, it is considered a LERCF. 13 CSR 35-71.015(1)(F). The new laws do not apply new background check and disclosure requirements only to CNSIMI's boarding school or even to individuals who are involved with children; the provisions consider CNSIMI *in toto* a LERCF, despite the boarding school being only one small element of Heartland's operations. Accordingly, every ministry and operation of CNSIMI is subject to the new rules.

longstanding and valued member of its community who is both beneficiary of and contributor to its redemptive mission: Janitor Ed Sonnier. With a 30-year-old conviction on his record, Heartland judges that its mission is elevated by the presence of a man living with sin redeemed. The State nevertheless requires that Heartland terminate his employment and exclude him from his community of at least seven years. This draconian, unjustified, and unconstitutional intervention cuts to the heart of Heartland's expressive mission. Importantly, it also demonstrates that CNSIMI's concerns that the new statutes will be applied in a way that undermines its mission are far from hypothetical.

Aside from constitutional violations, there are applications of Missouri's new laws that require CNSIMI to violate other laws. For instance, the new law requires CNSIMI to notify the State of all residents at CNSIMI, which includes those in the recovery programs. Federal law, however, requires that drug and alcohol rehab facilities keep confidential the identities of those in their programs. 42 U.S.C. 290dd-2 and 42 U.S.C. 290ee-3. This Court has previously found in favor of CNSIMI, pursuant to the federal rules, regarding its claims that it cannot reveal the identities of those in its recovery programs. *In re Employment Records of John Does Employed by Sharpe Holdings*, 4:17MC238 RLW, 2017 WL 6547738 (E.D. Mo. 2017).

These are only a few of the problems alleged in CNSIMI's seven-count complaint challenging Missouri's new laws. There are no material factual disputes in this case, and Plaintiff is entitled to judgment as a matter of law on all counts.

## FACTUAL BACKGROUND

### A.      Parties

Plaintiff CNS International Ministries, Inc. ("CNSIMI" or "Heartland"), is a Missouri not-for-profit corporation in good standing, located in the Eastern District of Missouri. CNSIMI

is exempt from Federal income tax under section 501(a) of the Internal Revenue Code as an organization described in § 501(c)(3). Plaintiff's Statement of Uncontroverted Material Facts (SUMF) at ¶1.

Defendant Robert Knodell is Acting Director of the Missouri Department of Social Services. SUMF at ¶2. He is sued in his official capacity.

### B.      Heartland is an Intentional Community

The Heartland community includes three residential recovery programs for troubled people: Heartland Children and Youth Home (consisting of a girls' recovery program and a boys' recovery program), Heartland Women's Recovery Program, and Heartland Men's Recovery Program. SUMF at ¶3.

Heartland also includes a K-12 school, which is attended by those in the boys' and girls' programs as well as children of staff and from the community at large. All school employees have a role in conveying Heartland's religious message and carrying out its religious mission. The teachers spend part of every workday performing duties related to inculcating the Christian faith. SUMF at ¶4.

Also located on the Heartland campus, though incorporated separately, are an accredited two-year college known as "Heartland Christian College" and Heartland Community Church. SUMF at ¶5.

Heartland's recovery programs, which have been continuously operating since the mid-1990s, seek to introduce the concepts of Christian living and personal responsibility, helping men and women and boys and girls who are bound with life-controlling addictions, attitudes, and behavioral problems. SUMF at ¶6.

There are currently five children in the boys' and girls' programs at Heartland—four

boys and one girl. In addition to tending to their studies, it has been common for boys and girls who are old enough to engage in part-time work in operations run by Heartland's affiliates. SUMF at ¶7.

The Heartland Men's Recovery Center houses men of all ages and from all over the United States. Men who enroll in the 12-month program find themselves in an environment far removed from the temptations of the world, combined with the disciplines of hard work and a focus on Jesus Christ. They reside in a part of Heartland's sprawling campus that is in Knox County, separated by a lake from the remainder of the residents—children, women, and college students—who reside in Shelby County. Men in the Recovery Program participate in daily devotions, chapel, and all weekly Heartland church services. SUMF at ¶8.

In the Heartland Women's Recovery Program, women live in a home-like environment while focusing on their relationship with Jesus Christ. They are trained in areas such as vocation, work ethic, child-rearing, and financial stewardship. Women in the Women's Home have a daily devotional time together and attend all weekly Heartland church services. The women participate in preparation of meals and daily chores to maintain and clean their home. SUMF at ¶9.

Because of the nature of addiction and recovery, many individuals in the recovery programs have criminal convictions or guilty pleas in their past, often involving drug-related offenses. SUMF at ¶10.

CNSIMI is assisted by the Internal Revenue Service of the Department of the Treasury through the allowance of income tax deductions for contributions to the program and through the granting of tax-exempt status to the program, in effect since October 2, 1995. SUMF at ¶11.

Heartland is an intentional community, which is one that is built around a specific interest or goal (similar to a religious order, a retirement community, or an artist colony). Heartland's

goal is to help those with life-controlling issues through redemption in the belief that Jesus Christ is the answer to every issue individuals face—including addiction, anger, broken homes, and financial crises. SUMF at ¶12. Men and women who commit themselves to the process of restoration find help at Heartland through the power of God and the encouragement of people who have walked a similar path. Heartland's vision is a Christ-centered, sustainable, intentional community of hope for the hurting built around a vibrant local church, cultivating individual, family, community, and global transformation through the power of the gospel. SUMF at ¶13. Christian belief and practice are integral to the identity of the CNSIMI, and adherence to Christian tenets is a deeply and sincerely held, integral aspect of Plaintiff. SUMF at ¶14.

Though separately incorporated as a legal entity, Heartland Community Church is at the heart of the Heartland community. Heartland believes that a church is the spiritual family of God, the Christian fellowship created by the Holy Spirit through the mighty acts of God in Christ Jesus. The "church" is more about being a living community on a daily basis than it is about a group of people gathering at a single time. Therefore, the church is not mainly a building or a meeting; it is a community of believers living together in a particular location. SUMF at ¶15.

Heartland believes that the church is the foundation of its community and that everything it does should have the church as its central purpose. The church's tenets of faith include:

  a. The Church as the Body of Christ, being seen visibly in distinct local fellowships, is God's chosen instrument to manifest the knowledge of His glory throughout the earth.
  b. Jesus Christ, upon ascending to the Father, commissioned all believers to take the Gospel to the ends of the earth. It is both the duty and privilege of believers to proclaim the Gospel, make disciples, and build the Church with people from all the nations.

SUMF at ¶16.

Heartland believes that making disciples is a community effort. Discipleship involves teaching, training and accountability. SUMF at ¶17.

6

Heartland recognizes that in the early days of the Church, shortly after Jesus Christ was raised from the dead, those who believed in Him devoted themselves to meeting together every day "in the temple and from house to house." During this time, they shared meals, praised God, and cared for each other. They also listened to teaching and welcomed new believers into their friendships. They enjoyed life together. SUMF at ¶18.

Heartland's recovery programs are about transformation, redemption, and restoration. To understand how to live healthy and productive lives, individuals need to walk alongside and interact with other imperfect people who are living healthy and productive lives. SUMF at ¶19. Heartland exists to provide all its residents with an opportunity to be an active participant. SUMF at ¶20. For these reasons, individuals in all the recovery programs attend church services and work jobs at Heartland, often volunteer jobs, just as others in the community do. SUMF at ¶21.

### C.  Heartland is a Safe Community.

Children in the Heartland Children and Youth Home are supervised by carefully vetted staff. For more than 20 years, CNSIMI has itself required anyone applying for a position that involved contact with children to report any criminal history, along with child abuse and neglect and sex offender information. In addition, CNSIMI's decades-long employment practice has been to obtain background checks from Missouri's State Highway Patrol and Family Care Safety Registry.[4] CNSIMI scrutinizes all history but treats only sex offender status as automatically

---

[4] The Family Care Safety Registry utilizes and reports the findings of:

    - State criminal history records maintained by the Missouri State Highway Patrol

    - Sex Offender Registry maintained by the Missouri State Highway Patrol

    - Child abuse/neglect records maintained by the Missouri Department of Social Services

    - The Employee Disqualification List maintained by the Missouri Department of Health and Senior Services

[*continued on next page*]

disqualifying. SUMF at ¶22.

To Heartland's knowledge, there is no listing in Missouri's Central Registry for Abuse and Neglect resulting from any incident between an adult and a child in Heartland's recovery programs in the past 20 years, and no felony or misdemeanor convictions resulting from such interactions in the entire history of Heartland, going back to the mid-1990s. SUMF at ¶23.

### D.  House Bill Nos. 557 and 560

Missouri House Bills 557 and 560 took effect on July 14, 2021. Those bills "amend[ed] chapter 210, RSMo, by adding thereto sixteen new sections relating to the protection of children, with penalty provisions and an emergency clause."

The statutes and related regulations, which went into effect on October 1, 2021, define "residential care facility" and "License-Exempt Residential Care Facility" ("LERCF") to include CNSIMI. 210.1253(6) RSMo.; 13 CSR 35-71.015(1)(F). To qualify as either, the new laws and regulations attach no significance to whether "homes," "places" and "facilities" receive children directly; they ask whether a home, place, or facility is "**operated by any person [CNSIMI, a nonprofit corporation] who receives children . . . .**" 210.1253(6) RSMo.; 13 CSR 35-71.015 (emphasis added).

In other words, the legal status of "LERCF" is tied to whether a facility's *operator* receives children. This status therefore does not apply facility by facility, but operator by operator. Because CNSIMI "receives children" and cares for them in the way designated by the

---

- The Employee Disqualification Registry maintained by the Missouri Department of Mental Health

- Child-care facility licensure records maintained by the Missouri Department of Elementary and Secondary Education

- Foster parent licensure records maintained by the Missouri Department of Social Services.

*See* § 210.900 RSMo, *et seq.*

regulation, all the "homes, places, and facilities" operated by CNSIMI are legally both

"residential care facilities" and LERCFs.[5] [6] 210.1253(6) RSMo.; 13 CSR 35-71.015.

### 1.      Compelled Notification Procedures

Heartland is required by the new law to make a host of notifications to the Department of

Social Services, Children's Division. 13 CSR 35-71.300(4)(5)(D)(1)-(9). Some of the most

troubling include:

> 2. The LERCF shall identify the name of the director, owner, operator, all staff
> members, volunteers, and any individual eighteen years of age or older who
> resides at or on the property of the LERCF. The LERCF shall provide the name,
> street address, physical and electronic mailing addresses, and phone number of
> the director or director's designee who will serve as the point of contact between
> the division and the LERCF.
> …
>
> 8. Proof that medical records are maintained for each child.
>
> > A. The division will accept a written attestation, made under oath, subject to
> > penalty of perjury, and executed by the director of the LERCF, that the
> > LERCF actually maintains medical records for each child served by the
> > LERCF according to the written policy of the LERCF, which shall be attached
> > to the attestation.
> >
> > B. The LERCF shall provide the division access to the facility upon request to
> > inspect the medical records maintained by the LERCF on the children served
> > by the LERCF in order to verify that the medical records are being kept. The
> > division will request access to this information only when the division has
> > reasonable basis to believe that the LERCF is not maintaining records for any
> > child as required by law.

---

[5] Defendant has previously argued that CNSIMI's recovery programs are not subject to the new notification
requirements because "the homes or facilities that house the Men's and Women's Recovery Programs are not
places, facilities, or homes that receive children." Doc. 46 at 2. Defendant ignores the clear wording of the law and
regulations. If the drafters had intended to designate a LERCF based on whether *it*—the facility, place, or home
itself—received children, it would actually have been easier for them; the drafters would have written "homes,
places and facilities **that receive** children . . . ." Instead, they wrote "homes, places and facilities **operated by any
person who receives children**." 210.1253(6) RSMo.; 13 CSR 35-71.015 (emphasis added).

[6] This definition's tremendous scope is the reason so absurdly many individuals, from CNSIMI's Board members to
its offsite lawyers and the janitors in other CNSIMI ministries are subject to the new notification and background
check/disqualification provisions. See fn.8 *infra* and accompanying text. A narrower definition could have restricted
the background checks and notification requirements to those involved in the care of children.

9. Background Check completion/eligibility. The director of the LERCF, or his or her authorized designee, shall certify, under oath subject to the penalties of perjury that all individuals who are required to complete a background check have successfully completed the background checks and have been found eligible for employment or presence at the LERCF pursuant to section 210.493, RSMo and 13 CSR 35-71.015.

13 CSR 35-71.300(4)(5)(D)(1)-(9).

Thus, according to 13 CSR 35-71.300(4)(5)(D)(2) and Section 210.1264, RSMo,

Heartland must notify the State of anyone who lives at Heartland, including those in drug and

alcohol recovery programs.

Violation of these notification requirements is punished by, inter alia, "injunctive relief to

cease the operation of the residential care facility and provide for the appropriate removal of the

children from the residential care facility . . ." § 210.1271(1), RSMo. There is no requirement in

Section 210.1271(1) that notice and a hearing to Heartland or its member precede such injunctive

relief. *See also* § 210.1268, RSMo.

## 2.  Required Background Checks

The new laws require CNSIMI to conduct background checks and impose State screening

criteria on:

Officers, managers, contractors, volunteers with access to children, employees, and other support staff of residential care facilities subject to the notification requirements under sections 210.1250 to 210.1286; any person eighteen years of age or older who resides at or on the property of such residential care facility; any person who has unsupervised contact with a resident of such residential care facility; and owners of such residential care facilities who will have access to the facilities shall undergo background checks under section 210.493.

§ 210.1263, RSMo; § 210.493, RSMo; 13 CSR 35-71.015(F). Background checks are also

required for those who *apply* for a position at CNSIMI. 13 CSR 35-71.015(1)(A). The

background checks are required for persons regardless of whether their positions typically (or

ever) involve contact with children at the facility. Regulations extend these checks as far as

"support staff," which includes "any individual who works for or performs services, including professional services, for the LERCF . . ." 13 CSR 35-71.015. This would include lawyers and accountants.

The required background checks are extensive, including:

(1) A Federal Bureau of Investigation fingerprint check;

(2) A search of the National Crime Information Center's National Sex Offender Registry; and

(3) A search of the following registries, repositories, or databases in Missouri, the state where the applicant resides, and each state where such applicant resided during the preceding five years:

(a) The state criminal registry or repository, with the use of fingerprints being required in the state where the applicant resides and optional in other states;
(b) The state sex offender registry or repository;
(c) The state family care safety registry; and
(d) The state-based child abuse and neglect registry and database.

§ 210.493(3), RSMo. The Children's Division is privy to the results of background checks.

§ 210.493, RSMo.

Failure to complete a background check renders an individual "ineligible for employment or service" at the facility. 13 CSR 35-71.015 (4)(A); Cf. § 210.493.10, RSMo. Section 210.1283, RSMo, also makes it a class B misdemeanor to knowingly fail to complete a background check as required under Section 210.493, RSMo. In other words, it criminalizes any applicant's refusal to waive her privacy rights.

Based on the results of these searching background checks, the regulations impose screening criteria for "eligibility" to be present at CNSIMI. An individual is "ineligible" for employment or presence at a LERCF if he or she:

(1) Refuses to consent to the background check as required by this section;

(2) Knowingly makes a materially false statement in connection with the background check as required by this section;

(3) Is registered, or is required to be registered, on a state sex offender registry or repository or the National Sex Offender Registry;

(4) Is listed as a perpetrator of child abuse or neglect under sections 210.109 to 210.183 or any other finding of child abuse or neglect based on any other state's registry or database; or

(5) Has pled guilty or nolo contendere to or been found guilty of:

> (a) Any felony for an offense against the person as defined in chapter 565;
> (b) Any other offense against the person involving the endangerment of a child as prescribed by law;
> (c) Any misdemeanor or felony for a sexual offense as defined in chapter 566;
> (d) Any misdemeanor or felony for an offense against the family as defined in chapter 568;
> (e) Burglary in the first degree as defined in section 569.160;
> (f) Any misdemeanor or felony for robbery as defined in chapter 570;
> (g) Any misdemeanor or felony for pornography or related offense as defined in chapter 573;
> (h) Any felony for arson as defined in chapter 569;
> (i) Any felony for armed criminal action as defined in section 571.015, unlawful use of a weapon as defined in section 571.030, unlawful possession of a firearm as defined in section 571.070, or the unlawful possession of an explosive as defined in section 571.072;
> (j) Any felony for making a terrorist threat as defined in section 574.115, 574.120, or 574.125;
> (k) A felony drug-related offense committed during the preceding five years; or
> (l) Any similar offense in any federal, state, or other court of similar jurisdiction of which the department has knowledge.

§ 210.493, RSMo. The regulations provide CNSIMI no freedom to contest a finding "ineligibility" on the basis of additional information, including an individual's need for restoration ministry or evidence of an individual's personal reform or restoration.

### 3.  Due Process Issues

### a.  Claims of Abuse or Neglect

Section 210.143 addresses claims by the Children's Division of child abuse or neglect at LERCFs. The process is for "the children's division," "law enforcement," or a "prosecuting or

circuit attorney" to petition the circuit court for an order directing a facility which is the subject

of an investigation of child abuse or neglect "to present the child at a place and time designated

by the court to a children's division worker for an assessment of the child's health, safety, and

well-being." § 210.143, RSMo.

The new law states that the court *shall* enter such an order if:

> (1) The court determines that there is reasonable cause to believe that the child
> has been abused or neglected and the residential care facility does not voluntarily
> provide access to the child;
>
> (2) The assessment is reasonably necessary for the completion of an investigation
> or the collection of evidence; and
>
> (3) Doing so is in the best interest of the child.

210.143(1), RSMo. The child can then be held for "assessment" for up to 72 hours. § 210.143(3),

RSMo. The provisions include no due process provisions for the child, the facility, or the parents

prior to the 72-hour removal.

If the child is held for assessment for more than 72 hours, there must be "a hearing with

**attempted** notice to the facility and to the parents or guardian and with due process for all

parties." § 210.143(3), RSMo (emphasis added). Only "attempted" notice is required, despite the

fact that the statutory scheme gives the Children's Division contact information for virtually all

leadership personnel at a facility, and even though the Children's Division knows how and where

to serve Heartland and its agents.

If the court enters an order to produce the child, the court may expand the order to produce

other children in the care of the residential care facility if the court finds there is

reasonable cause to believe that such children may have been abused or neglected. § 210.143(4),

RSMo. The new regulations thus contemplate mass removals of students based on only a

"reasonable belief" standard:

The petition and order may be made on an *ex parte* basis if it is reasonable to believe that providing notice may place the child at risk for further abuse or neglect, if it is reasonable to believe that providing notice may cause the child to be removed from the state of Missouri or the jurisdiction of the court, or if it is reasonable to believe that evidence relevant to the investigation will be unavailable if the *ex parte* order is not entered.

210.143(5), RSMo.

Once a facility is served with "a subpoena, petition, or order," the process is as follows:

Any person served with a subpoena, petition, or order under this section shall not be required to file an answer, but may file a motion for a protective order or other appropriate relief. The motion shall be filed at or before the time for production or disclosure set out in the subpoena or order. The motion shall be in writing, but it may be informal and no particular form shall be required. The clerk shall serve a copy of the motion on the director of the children's division and any agency who applied for the order. The court shall expedite a hearing on the motion and shall issue its decision no later than one business day after the date the motion is filed. The court may review the motion in camera and stay implementation of the order once for up to three days. The in camera review shall be conducted on the record, but steps shall be taken to protect the identity of the child. Any information that may reveal the identity of a hotline reporter shall not be disclosed to anyone in any proceeding under this subsection unless otherwise allowed by law.

§ 210.143.6., RSMo.

### b.  Background Check Ineligibility

In the event the State finds an applicant ineligible for presence at CNSIMI based on the results of a State-required background check, the State will not reveal to CNSIMI the basis for such judgment. § 210.493(9), RSMo. Individuals subject to ineligibility determinations may seek an informal administrative review without the benefit of the rules of evidence. 13 CSR 35-71.015(12)(B). Despite lack of information about the grounds, a facility can raise an informal but on-the-record appeal of limited scope to the Department of Social Services. 13 CSR 35-71.015(12)(C). Ultimately, applicants and aggrieved facilities can seek judicial review, but the standard is deferential toward the State. 13 CSR 35-71.015(12)(D); § 536.150, RSMo.

**E. Heartland's Association Rights and Staff are already in the State's Crosshairs.**

The State has already deemed two Heartland employees ineligible to work there. SUMF at ¶24. Edward Sonnier has been a school janitor at Heartland since 2015. A background check made pursuant to the new law reflected that in 1994, he pled guilty in the Circuit Court of St. Louis to a disqualifying offense: unlawful use of a weapon. Solely because of this offense, which occurred almost thirty years ago and had nothing to do with children, Mr. Sonnier has been deemed by the State ineligible to continue his janitorial work at school at Heartland. SUMF at ¶25.

Sara Morgan has been a lunchroom supervisor at Heartland since 2020. A background check made pursuant to the new law reflected that in 2011, Ms. Morgan pled guilty to a felony arson charge. Solely because of this offense, which occurred more than a decade ago and had nothing to do with children, Ms. Morgan has been deemed by the State ineligible to continue her lunchroom supervision duties at school at Heartland. SUMF at ¶26.

## ARGUMENT

### Summary Judgment Standard, Injunctive Relief Standard, and Burden of Proof

Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if the information before the Court shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c) of the Federal Rules of Civil Procedure). An issue of material fact is genuine if it has a real basis in the record, and a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The initial burden is on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *Van Horn v. Best Buy Stores*, 526 F.3d 1144, 1146 (8th Cir. 2008). After the moving party discharges this burden, the non-moving party bears the burden of setting forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 565-66 (8th Cir. 2000); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[I]n order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Webb v. Lawrence County*, 144 F.3d 1131, 1135 (8th Cir. 1998); *see also Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 909 (8th Cir. 1999) (finding that general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).

To obtain a permanent injunction, a plaintiff is required to show: (1) success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011).

With regard to showing irreparable injury, Supreme Court precedent is clear: "Loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When a constitutional right is impaired, a finding of irreparable injury is mandatory. *See id*.

As to Plaintiffs' First Amendment claim, where the government is regulating expressive activity, the government bears the burden of proving that its actions pass constitutional muster. *See, e.g.*, *Perry Ed. Assn. v. Perry Local Ed. Assn.*, 460 U.S. 37, 45-46 (1983). "[W]hen a

regulation allegedly infringes on the exercise of first amendment rights, the statute's proponent bears the burden of establishing the statute's constitutionality." *Ass'n of Cmty. Organizations for Reform Now v. City of Frontenac*, 714 F.2d 813, 817 (8th Cir. 1983); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (proponent "carries a heavy burden of showing justification" for speech restriction); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 658 (1981) (Brennan, J., concurring).

When a law restricts speech, the government's burden to produce evidence is not satisfied by mere speculation or conjecture; it must offer real evidence establishing that the problem it identifies is real and that the speech restriction will materially alleviate it. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *see also U.S. v. Playboy Entm't Grp.*, 529 U.S. 803 (2000). For example, in a case where limitations on campaign contributions restricted speech, the Supreme Court held that "Congress must show *concrete evidence* that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption[.]" *McConnell v. FEC*, 540 U.S. 93, 185-86 n.72 (2003) (emphasis added) (overruled on other grounds in *Citizens United v. Federal Election Comm'n*, 130 S. Ct. 876 (2010)).

## I.      Plaintiff is entitled to summary judgment on its claim that the State's new disclosure laws violate federal privacy laws (Count I).

Pursuant to federal law (42 U.S.C. § 290dd-2 and 42 U.S.C. § 290ee-3), CNSIMI is required to observe strict confidentiality regarding any patient-identifying records related to those in its drug and alcohol recovery programs.

Further, pursuant to 42 CFR § 2.11, CNSIMI holds itself out as providing and does provide alcohol or drug abuse diagnosis, treatment or referral for treatment. Pursuant to 42 CFR § 2.12(b)(4), CNSIMI is the recipient of federal assistance because it is assisted by the Internal

Revenue Service of the Department of the Treasury through the allowance of income tax deductions for contributions to the program and through the granting of tax-exempt status to the program.

As such, pursuant to 42 CFR § 2.13(2), CNSIMI is restricted from disclosing alcohol or drug abuse patient records. In addition, 42 CFR § 2.12(d)(1)-(2) provides that these restrictions also apply to any persons who receive patient records from such a program. "Person" means an individual, partnership, corporation, federal, state or local government agency, or any other legal entity.

The newly enacted Section 210.1262, part of the Residential Care Facility Notification Act, states that a facility such as CNSIMI must notify the Department of Social Services of, *inter alia*, the "[n]ame of the director, owner, operator, all staff members, volunteers, and ***any individual eighteen years of age or older who resides at or on the property*** of the residential care facility." This notification rule is currently in effect and requires the disclosure of the names of those in Heartland's recovery programs. Failure to fulfill these notification requirements is grounds for, *inter alia*, "injunctive relief to cease the operation of the residential care facility and provide for the appropriate removal of the children from the residential care facility . . ." § 210.1271.1, RSMo.

Moreover, Section 210.493, RSMo, which requires background checks provided to the State for those at Heartland, also requires Heartland to reveal the identities of those in the Recovery Programs.

The records sought by the Department of Social Services under these two new provisions are confidential under federal law because they reveal the names of individuals participating in the Recovery Programs. 42 U.S.C. § 290dd-2(b)(2)(a).

The federal privacy statute and governing regulations "carry a strong presumption against disclosing records of this kind. 42 U.S.C. § 290ee-3(a) [now 290dd-2]. The express purpose of this provision is to encourage patients to seek treatment for substance abuse without fear that by doing so, their privacy will be compromised." *United States v. Cresta*, 825 F.2d 538, 551-52 (1st Cir. 1987), *cert. denied*, 486 U.S. 1042 (1988). The reason for the privilege is clear – it is "a response to the considerable stigma long associated with, and still attached to, substance use disorders." *See Confidentiality of Alcohol and Other Drug Abuse Treatment Information for Emergency Department and Trauma Center Patients*, 20 Health Matrix 387, 388 (2010). "The purpose of the federal statute is to encourage patients to seek treatment for substance abuse by assuring them that their privacy will not be compromised." *In re B.S.*, 659 F.2d 1137, 1139 (Vt. 1995) (citing *Whyte v. Connecticut Mutual Life Ins. Co.*, 818 F.2d 1005, 1010 (1st Cir. 1987)).

"Congress felt that 'the strictest adherence' to the confidentiality provisions was needed, lest individuals in need of drug abuse treatment be dissuaded from seeking help." *Ellison v. Cocke Cty. Tenn*, 63 F.3d 467, 471 (6th Cir. 1995); *see also U.S. ex. rel Chandler v. Cook Cty., Ill.*, 277 F.3d 969, 981 (7th Cir. 2002) ("It is not only the privacy rights of individual patients that are at stake here, but also the continued effectiveness and viability of important substance abuse treatment programs . . . Patients will be less willing to seek treatment if patient confidentiality is not strictly protected.").

Pursuant to 42 CFR § 2.20, "no state law may either authorize or compel any disclosure prohibited by the regulations in this part."

This Court has found in favor of CNSIMI, pursuant to the federal rules cited herein, regarding its claims that it cannot reveal the identities of those in its recovery programs. *In re Employment Records of John Does Employed by Sharpe Holdings*, 4:17MC238 RLW, 2017 WL

6547738 (E.D. Mo. 2017).

Because of the overreaching of the new Missouri laws, if Plaintiff complies with the new law and identifies those in the recovery programs, it will face federal criminal charges and fines. 42 U.S.C. 290dd-2(f); 42 U.S.C. 1320d-5, 1320d-6. Further, recovery program participants themselves face criminal charges under § 210.1283, RSMo, if they do not subject themselves to background checks (as residents at a LERCF—210.493(2), RSMo), which would identify them as program participants.

This is precisely the type of case the Declaratory Judgment Act is designed to address, because CNSIMI requires a definitive articulation of its responsibilities under these two competing statutes.10 Fed. Procedure, L. Ed. Declaratory Judgments 23:2 (2007) (purpose of the Declaratory Judgment Act is to enable parties uncertain of their legal rights and obligations to seek a declaration of their rights and settle the controversy before duties are breached); *see also Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (federal court jurisdiction present where state-law claims "implicate significant federal issues").

## II.     Plaintiff is entitled to summary judgment on its claim that the State's new background check and disclosure laws violate Plaintiff's right to expressive association (Count II).

The fundamental right to expressive association was first articulated in *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958), where Justice Harlan wrote for the Court that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking on the close nexus between the freedoms of speech and assembly." *Id*. at 460; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in

pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). "The reason we have extended First Amendment protection in this way is clear: The right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 68 (2006) (*FAIR*); *see also Roberts*, 468 U.S. at 633 (O'Connor, J., concurring) ("Protection of the association's right to define its membership derives from the recognition that the formation of an expressive association is the creation of a voice, and the selection of members is the definition of that voice.").

CNSIMI is entitled to summary judgment on its second count alleging that Section 210.1262 violates its right to expressive association by imposing threats and burdens on those who join in its Christian beliefs and practices. *Roberts*, 468 U.S. at 633 (O'Connor, J., concurring).

### A.  The Disclosure Requirements Burden Expressive Association.

Specifically, Section 210.1262 requires, unquestionably and as described *supra*, that CNSIMI provide the State with the names of those in its drug and alcohol recovery programs. The negative implications of these mandated disclosures are immense, as disclosure requirements may dissuade those in recovery programs from continuing or deter potential new members from joining, which in turn would jeopardize the programs themselves.

Congress and federal courts have recognized the damage done to associations when those in their alcohol and drug rehabilitation facilities are denied confidentiality. "Congress felt that 'the strictest adherence' to the confidentiality provisions was needed, lest individuals in need of drug abuse treatment be dissuaded from seeking help." *Ellison v. Cocke Cty. Tenn*, 63 F.3d 467, 471 (6th Cir. 1995); *see also U.S. ex. rel Chandler v. Cook Cty., Ill.,* 277 F.3d 969, 981 (7th Cir.

2002) ("Patients will be less willing to seek treatment if patient confidentiality is not strictly protected.").

For these reasons, the Supreme Court has ruled that "compelled disclosure requirements are reviewed under exacting scrutiny," and even a "legitimate and substantial" governmental interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383-84 (2021); *see also Roberts*, 468 U.S. at 622-23 ("Government actions that may unconstitutionally infringe upon this freedom can take a number of forms [including an] attempt to require disclosure of the fact of membership in a group seeking anonymity.").

The State, here, could easily pursue its goals with a narrower disclosure requirement that applies only to those with regular contact with children and excludes those in Heartland's recovery programs. This would cure most defects with the challenged laws.[7] Because the State could so easily pursue its goals by narrower means, the disclosure requirements fail "exacting scrutiny" and violate CNSIMI's association rights.

### B. The Background Check Requirements Burden Expressive Association.

The State's background check requirements also threaten CNSIMI's association rights. Background checks are prior restraints on both the LECRF's and adherent individuals' rights to associate, because they punish association without these background checks with criminal sanctions and/or the threat of said sanctions.

The statutorily defined purpose of each background check is to determine whether an individual is "eligible or ineligible for employment ***or presence at*** the residential care facility."

---

[7] The laws would still run afoul of Heartland's right to Church autonomy (described *infra*), whereby the State may not disqualify CNSIMI's pastors and religious instructors based on background checks.

Section 210.493(10) (emphasis added). Failure to complete a background check makes an individual guilty of a Class B misdemeanor. Section 210.1283. The LERCF likewise is required to compel these disclosures. 13 CSR 35-71.300(5)(D)(9).

As laid out *supra* in Factual Background, Part D, the new law's definition of CNSIMI *in toto* as a LERCF has the absurd result of requiring CNSIMI and its members to require/submit to these background checks comprehensively, regardless of whether an individual typically (or ever) has contact with children. CNSIMI must require background checks into the members of the executive suite, into maintenance employees at buildings serving only adults, and into off-site legal and financial professionals, just to list several examples, as well as to all applicants for these positions. *See supra* Factual Background, Part D.2 (citing § 210.1263, RSMo; § 210.493, RSMo; 13 CSR 35-71.015); Doc. 23 ¶105.[8]

The State then further broadens the scope of individuals required to undergo these intrusive background checks, 210.1263, RSMo; 210.493, RSMo; 13 CSR 35-71.015(1)(F), by expanding by regulation the customary meaning of certain terms. "Officer," for instance, includes "any individual who holds an executive position" including President, Chairperson of Board, Board Vice President, Board Vice Chair, Board Secretary, "any other position designated as an officer in the bylaws or articles of incorporation or organization," Headmaster, Principal, Head Teacher, Director, Chief Executive Officer, and even General Counsel. See 13 CSR 35-71.015(1)(I).[9] Imposing on all of these individuals an intrusive background check as a condition

---

[8] Requiring that "support staff" undergo background checks is not an insubstantial burden on CNSIMI's ability to operate, as it may be difficult to find accountants, lawyers, and consultants who are willing to submit to FBI background and fingerprint checks as a condition of taking CNSIMI on as a client.

[9] By controlling CNSIMI's Board of Directors, the State is wresting control of the entire organization. CNSIMI is governed by its Board of Directors. In turn, the Board of Directors appoints the ministry's officers, which include the President, Treasurer, Secretary, etc. These officers, in turn, appoint managers, and so forth down through the ranks of employees, support staff, contractors, all the way to volunteers. SUMF at ¶28. The key role of the Board of Directors is implicit in the doctrine of religious organization autonomy, as well. *See infra* Part V, p. 32.

of service at CNSIMI simply expands the illegal burden Missouri's new laws impose on CNSIMI's expressive association.[10]

### C. The Screening Requirements Burden Expressive Association.

The State's asserted right to declare individuals "ineligible" to be members of the Heartland community is an outright arrogation of CNSIMI's right as an expressive association to define its membership. Although expressive association claims often involve the right to *exclude* outsiders from the association, they can also involve claims to *include* those the State wants to bar from the association. *Heartland Acad. Cmty. Church v. Waddle,* 427 F.3d 525, 535 (8th Cir. 2005) (right to association violated when children illegally removed from school). The screening requirements associated with the background checks illegally substitute the State's judgment for CNSIMI's judgment about whom to include in the membership of its expressive association.

Under the new laws, the results of background checks automatically, mechanistically determine whether a community member can remain at Heartland, regardless of CNSIMI's judgment. The new laws declare an individual "ineligible" to be at Heartland if he or she refuses to consent to a background check, is registered in certain state registries, or has pled guilty to or been convicted of certain crimes, including, for instance, "felony drug-related offenses." § 210.493, RSMo. Again, these individuals are ineligible to remain at CNSIMI regardless of whether they have any unsupervised contact with children and, in many cases, whether their criminal offenses have anything to do with children.

The most direct and obvious curtailment of Heartland's association rights is the fact that in many instances those whose background checks would show "felony drug-related offense(s)

---

[10] Expanding the State's background check requirements to include more and more of CNSIMI's leaders also makes the new laws more obviously and ponderously violative of CNSIMI's autonomy, as a religious organization, to choose its own leaders and ministers. *See infra* Part V, p. 32.

committed during the preceding five years" are ineligible to be present at Heartland. This requirement could empty the recovery programs, which are a central part of Heartland's mission.

The screening requirements are equally problematic as burdens on expressive association when they are applied to exclude valued employees like two the Children's Division has already moved to exclude from Heartland. Edward Sonnier has been a school janitor at Heartland since 2015, and he has been deemed unfit by the State for continued employment because in 1994 he pled guilty in the Circuit Court of St. Louis to a disqualifying offense: unlawful use of a weapon. SUMF at ¶25. Sara Morgan has been a lunchroom supervisor at Heartland since 2020, and she has been deemed unfit by the State for continued employment because in 2011, Ms. Morgan pled guilty to a felony arson charge. SUMF at ¶26. Both of these offenses are over a decade old and have absolutely nothing to do with children. CNSIMI highly values these two individuals as fruitful contributors to its community, and the State has no right to second-guess its judgment as to its own membership.

By replacing CNSIMI as the arbiter of who can be present at Heartland, the State's disclosure, background check, and screening requirements limit CNSIMI's freedom to form an expressive association of those who share a common commitment to education, addiction recovery, and religious faith. The new laws require disclosure of the identities of those in recovery programs; burden those seeking membership in the Heartland community; and exclude from Heartland people whose histories include problems that are irrelevant to child abuse or endangerment, including the very problems that would lead them into a recovery program or otherwise toward a community like Heartland. These are all attacks on CNSIMI's ability to

associate freely, define its membership, and share common goals and faith, and they are impermissible under the First Amendment.[11]

### III.   Plaintiff is entitled to summary judgment on its claim that the State's new background check laws and child removal provisions violate Plaintiff's procedural due process rights (Count III).

Plaintiff's third count raises procedural due process concerns with the new Missouri statutes based on (a) the threatened removal of students without meeting established due process standards, and (b) the determination based on background checks, in a manner that conflicts with federal constitutional, statutory and regulatory law, that certain individuals are ineligible to remain at or be employed by CNSIMI.

### A. Removal of Students without Due Process

Violation of Missouri's new notification requirements is punished by, *inter alia*, "injunctive relief to cease the operation of the residential care facility and provide for the appropriate removal of the children from the residential care facility . . ." § 210.1271(1), RSMo. There is no requirement in Section 210.1271(1) that notice to and a hearing for CNSIMI or its members precede such injunctive relief. *See also* § 210.1268, RSMo.

A separate section, Section 210.143, governs claims of child abuse or neglect at LERCFs, such as CNSIMI. That process requires that "the children's division," "law enforcement," or a

---

[11] It is true that "the right to expressive association is not absolute and can be abridged in the face of 'compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 535 (8th Cir. 2005) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). Under strict scrutiny, it is the governmental entity's burden to "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest . . ." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

The government's interest here, protecting children, could be protected by a myriad of significantly less restrictive means. Background checks targeted toward child abuse and neglect, or sexual abuse, could apply to those who have routine contact with children, such as teachers and house parents, and not those in recovery programs or those working in professional services capacities. Disqualifying convictions could include those that have some possible connection with child abuse, and would not have to include, as in Heartland's janitor's case, a gun conviction from 1994. Again, it is the government's burden to show that it is using means that are least restrictive.

"prosecuting or circuit attorney" petition the circuit court for an order directing a facility that is

the subject of an investigation of allegations of child abuse or neglect "to present the child at a

place and time designated by the court to a children's division worker for an assessment of the

child's health, safety, and well-being." § 210.143, RSMo. The child can then be held for

"assessment" for up to 72 hours. § 210.143(3), RSMo.

The new statutes provide no due process for the child, CNSIMI, or the parents prior to a

72-hour removal. If the child is held for assessment for more than 72 hours, there must be "a

hearing with **attempted** notice to the facility and to the parents or guardian and with due process

for all parties." 210.143(3) (emphasis added). Only "attempted" notice is required, even though

the statutory scheme gives the State of Missouri Children's Division contact information for

virtually all leadership personnel at a facility, and despite the fact that the Children's Division

knows how and where to serve CNSIMI and its agents.

The new regulations further authorize removals of students without notice based on only

a "reasonable belief" standard:

> The petition and order may be made on an *ex parte* basis if it is reasonable to believe that
> providing notice may place the child at risk for further abuse or neglect, if it is reasonable to
> believe that providing notice may cause the child to be removed from the state of Missouri or
> the jurisdiction of the court, or if it is reasonable to believe that evidence relevant to the
> investigation will be unavailable if the *ex parte* order is not entered.

210.143(5), RSMo.

If a facility such as Heartland happens to be served with "a subpoena, petition, or order,"

the new laws provide for some limited attempts at due process:

> Any person served with a subpoena, petition, or order under this section shall not be required
> to file an answer, but may file a motion for a protective order or other appropriate relief. The
> motion shall be filed at or before the time for production or disclosure set out in the subpoena
> or order. The motion shall be in writing, but it may be informal and no particular form shall
> be required. The clerk shall serve a copy of the motion on the director of the children's
> division and any agency who applied for the order. The court shall expedite a hearing on the

27

> motion and shall issue its decision no later than one business day after the date the motion is filed. The court may review the motion in camera and stay implementation of the order once for up to three days. The in camera review shall be conducted on the record, but steps shall be taken to protect the identity of the child. Any information that may reveal the identity of a hotline reporter shall not be disclosed to anyone in any proceeding under this subsection unless otherwise allowed by law.

210.143.6, RSMo. However, it is unclear under what circumstances a facility would be served with "a subpoena, petition, or order," given that *ex parte* applications are allowed.[12]

None of these new provisions provides adequate due process for removing a child from Heartland, the standard for which was clearly articulated years ago by Judge Webber of the United States District Court for Eastern District of Missouri, after the State wrongfully removed 115 students from Heartland: the State must provide notice and a hearing prior to removing any child from Heartland unless there is reasonable cause to believe that that particular child is "in imminent danger of suffering serious physical harm, threat to life from abuse or neglect, or has been sexually abused or is in imminent danger of sexual abuse." *Heartland Academy Community Church v. Waddle,* 317 F. Supp. 2d 984, 1111 (E.D. Mo. 2004), *aff'd, Heartland Academy Community Church v. Waddle,* 427 F.3d 525 (8th Cir. 2005). The State's attempt to institute a new statutory scheme falls well short of this clear due process standard, ignoring the directly applicable *Waddle* holding.

### B.  Background Check Ineligibility without Due Process

Defendant's background check process similarly does not satisfy procedural due process requirements. If an individual is rendered "ineligible" to be present at an LERCF such as

---

[12] Defendant defends the *ex parte* applications by noting that a subsequent hearing is required under Section 210.1271.2. Doc. 27 at 6. But, again, only *attempted notice* of such a hearing to the parties, and not *actual notice*, is required. § 210.1271.2, RSMo.

CNSIMI because of information revealed in a background check, there is only limited opportunity for review and limited information provided to the facility.

At the outset, any appeal is hindered by the fact that the law prohibits notice to the facility of what renders an individual ineligible: "The department shall not reveal to the residential care facility or the child placing agency any disqualifying offense or other related information regarding the applicant." § 210.493(9), RSMo. A facility like CNSIMI cannot meaningfully review or appeal an ineligibility finding without knowing the reasons behind it.

Even where grounds are known, individuals may be ineligible to associate with or remain at Heartland even if their names have been placed on a central registry merely on the basis of probable cause or reasonable suspicion, regardless of whether they obtained a due process hearing, and regardless of whether they had *de novo* appeal rights in a court of law, all of which is contrary to the 14th Amendment to the U.S. Constitution. *Jamison v. Dept. of Soc. Servs.,* 218 S.W.3d 399 (Mo. 2007). The *Jamison* court did allow the Missouri DSS to retain information based on probable cause, but only for its own internal purposes, and not for dissemination, because dissemination would interfere with liberty interests by causing job losses. *Id.* at 412 n.14. But actually disqualifying individuals from employment on the unconstitutional grounds that they were listed on the basis of probable cause, as the new law requires, is worse than the mere dissemination prohibited by *Jamison.*

Finally, the ineligibility determination and the appeal process themselves lack due process protections. 13 CSR 35-71.015(12)(B) explains the administrative review process leading to the exclusion of an individual from CNSIMI:

> a) The Administrative Review shall be conducted and decided based upon the written materials submitted to the division and any information and materials presented at a review conference. The division will provide an in-person conference upon written request.

b) The review conference may take place by telephone conference call, video conference or in-person meeting.

c) The Administrative Review process shall be informal. **The rules of evidence shall not apply. There is no right to conduct discovery. There shall be no right to compel the production of witnesses or evidence by subpoena or otherwise.**

d) The Administrative Review shall be conducted by an individual designated by the Director of the Department or the division, who may be an employee of the division or the Department. However, the individual shall not have been involved in making the decision which is subject to review.

e) The individual conducting the Administrative Review shall conduct the administrative review and render a written decision no later than thirty (30) days from the date that the division received the request for administrative review.

f) **The decision upon Administrative Review shall be the final decision of the Department as to any person that is not an applicant.**

Emphasis added. The regulations therefore explicitly deny the facility and/or its applicant or employee anything resembling a due process hearing. There is no discovery, no compelling of witnesses or evidence, and, apparently, no testimony under oath. Nor are any rules of evidence.employed.

Despite this informality and the prohibition against disclosing to a facility the basis for a determination, a facility can appeal. This entails an Administrative Review before the Administrative Hearings Unit of the Division of Legal Services of the Department of Social Services. 13 CSR 35-71.015(12)(C). Here, again, there are severe limitations on due process:

The hearing is and **shall not be an opportunity to collaterally attack or re-litigate the validity of the underlying plea of guilt, plea of nolo contendere, or the underlying finding of child abuse, neglect or maltreatment** by the applicable state or local agency, or the accuracy of information in the federal, state or local registry or repository.

13 CSR 35-71.015(12)(C)(8) (emphasis added). Appeal hearings are "informal, but they shall be held on the record and testimony will be adduced under oath. **The rules of evidence do not apply.** The applicant may be represented by an attorney." 13 CSR 35-71.015(12)(C)(6) (emphasis added).

Ultimately, applicants and facilities have access to only limited judicial review.

1. Any applicant aggrieved by the final decision of the Department after appeal may seek judicial review as provided in section 536.150 RSMo.

2. Any person who is not an applicant who is aggrieved by the final decision of the Department after Administrative Review may seek judicial review as provided in section 536.150, RSMo.

13 CSR 35-71.015(12)(D). The judicial review is classified as *de novo*, but the decision will only be reversed if "unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion." § 536.150, RSMo.

Just like the State's new rules for removal of children from Heartland, under no circumstances do the background check procedures and reviews in place satisfy due process.[13]

## IV.  Plaintiff is entitled to summary judgment on its claim that the State's new background check laws and child removal provisions violate parental rights as laid out in *Pierce v. Society of Sisters* (Count IV).

The new state laws violate parents' rights under *Pierce v. Society of Sisters,* 268 U.S. 510 (1925), to "direct the upbringing and education of children under their control" by selecting schools that exemplify the values and principles they want their children to learn. *Id.* at 534-35. "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* By interfering with the employment decisions of Plaintiff, and by threatening to remove students without due process, the new state laws usurp the "right [and] high duty" of parents to select an educational program that prepares their children to live up to the obligations of the Christian faith.

---

[13] As discussed *infra* regarding Count VII, federal background check law (28 CFR 50.12) allows a collateral attack on the underlying convictions or pleas revealed in background checks. The new Missouri law, in addition to its limited review process, expressly denies the right to a collateral attack on items revealed in the background check. 13 CSR 35-71.015(12)(C)(8).

In *Pierce*, a parochial school was granted standing to challenge an Oregon statute that required all children to attend public school. *Id*. at 530. The religious school successfully argued that the statutory requirement violated the rights of parents to direct the upbringing of their children, even though no parent was a plaintiff in the suit. *Id*. at 531-35. Because of the close relationship between the school and the parents, and because the school had an interest in the parents' (the third parties') constitutionally protected activity, the school had third-party as well as primary standing. *Id*. at 535-36.

*Pierce* involved both injury to the parochial school itself (*i.e.*, being "threatened with destruction through the unwarranted compulsion which appellants are exercising over present and prospective patrons of their schools," *id*. at 535) and violation of the fundamental rights of parents and children (*i.e.*, "the right of parents to choose schools where their children will receive appropriate mental and religious training, the right of the child to influence the parents' choice of a school . . .," *id*. at 532).

Similarly, this case involves both injury to the school at Heartland (an interference with Heartland's choice of employees and ministers) and a violation of the fundamental rights of parents and their children to choose their place of education and religious learning. The new laws, threatening Heartland with removals and ceased operations, deprive students' parents of a fair opportunity to procure for their children instruction that they think is important and that they have selected at least in part for religious reasons. *See Heartland Academy Community Church v. Waddle,* 317 F. Supp. 2d 984, 1100-01 (E.D. Mo. 2004), *aff'd, Heartland Academy Community Church v. Waddle,* 427 F.3d 525 (8th Cir. 2005) (finding that the defendant "violated Plaintiffs' right to family integrity when he removed the children on October 30, 2001, without notice or an opportunity to be heard and in the absence of exigent circumstances").

Accordingly, under *Pierce*, as applied to the school at Heartland, the news laws are repugnant to the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. Heartland is entitled to summary judgment on its due process claim under *Pierce v. Society of Sisters*.

## V.   Plaintiff is entitled to summary judgment on its claim that the State's new background check laws and related employment disqualification rules violate Heartland's right to autonomy under *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (Count V).

In *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, the Supreme Court recognized that the First Amendment Religion Clauses grant religious organizations broad authority to hire and fire "ministers" without government interference by way of employment discrimination laws. *See* 565 U.S. 171, 181-90 (2012). "Requiring a church to . . . retain an unwanted minister . . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 188. By imposing constraints on the employment decisions of religious employers, such as Heartland, the new laws subject Plaintiff to precisely the sort of government interference that *Hosanna-Tabor* forbids.

The *Hosanna-Tabor* Court declined to adopt a rigid formula for determining whether an employee qualifies as a "minister," but it did establish that it is a broad category, "not limited to the head of a religious congregation," *id.* at 190. That category would undoubtedly encompass teachers in private schools, and especially teachers of religion. Indeed, the dismissed employee in *Hosanna-Tabor* was herself a fourth-grade teacher, who taught both religious and secular subjects. *Id.* at 178, 196. Although she apparently only spent 45 minutes a day on her religious duties, the Supreme Court held that the ministerial exception barred her from pursuing a disability employment discrimination claim. *See id.* at 193. The Supreme Court criticized the lower court for "plac[ing] too much emphasis" on the proportion of time she spent on secular

33

duties, observing that the question of whether an employee's religious duties warrant application of the ministerial exception "is not one that can be resolved by a stopwatch." *Id.* at 193-94. Instead, the Court considered a number of other factual circumstances, including the fact that the claimant had undertaken "a significant degree of religious training" in order to qualify for her position, and that her "job duties reflected a role in conveying the Church's message and carrying out its mission." *Id*. at 191-92.[14]

*Hosanna-Tabor*'s conclusion is consistent with decades of case law recognizing that religious schools play a critical role in the transmission of religious faith and that the government should accordingly hesitate to interfere with their employment decisions. *See, e.g.*, *Little v. Wuerl*, 929 F.2d 944, 948 (3d Cir. 1991); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501, 504 (1979).

Many, if not all, of Heartland's school teachers qualify as "ministers" under *Hosanna-Tabor*. All its elementary school employees have "job duties [that] reflect[] a role in conveying the Church's message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192. Like the teacher in *Hosanna-Tabor*, the teachers at Heartland spend part of every workday performing duties related to inculcating religious faith in schoolchildren. SUMF at ¶27. If there is any doubt about the "ministerial" status of other regular school employees, there is absolutely no question that Heartland's religion teachers, who are the primary source of religious instruction to students and thus play a critical role in transmitting the Christian faith, qualify as "ministers" under *Hosanna-Tabor*. *Id*.

---

[14] Although Plaintiff submits that this case's facts are sufficiently similar to those of *Hosanna-Tabor* to be squarely controlled by that case, it is also true that *Hosanna-Tabor*'s progeny have applied the ministerial exception even more broadly. *See, e.g.*, *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012) (church music director considered to be minister); *Ginalski v. Diocese of Gary*, 2016 WL 7100558, *8 (Dec. 5, 2016) (school principal a minister despite "lack of evidence of involvement in religious activity").

More important and more obviously defective from a constitutional perspective, the State's new law purports to disqualify *even a pastor* at CNSIMI based on background checks. And because of the State's broad definitions of terms, such as "officer" including principals and head teachers, the scope of the effect on Plaintiff's church autonomy is expansive. *See supra* Part II and notes 8-10. The State, under clear church autonomy precedent, cannot invade a religious entity's sphere of autonomy in such a way.

The broad scope of individuals required to undergo these intrusive background checks—including the President, Chairperson of Board, Board Vice President, Board Vice Chair, Board Secretary, Headmaster, Principal, Head Teacher, Director, Chief Executive Officer, and even General Counsel[15]—further threaten Plaintiff's autonomy. If the State controls who CNSIMI's board is and who its officers are, then CNSIMI has no authority over its own structure and governance. *See supra* notes 8-10.

The Religion Clauses of the First Amendment vest in churches and religious schools the autonomy to order their own affairs, including to decide for themselves, free from governmental interference, matters of church government and doctrine, the communication of that doctrine, and internal administration of their own institutions. *See* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy,* 81 COLUM. L. REV. 1373, 1388-89 (1981). Under the Religion Clauses, decisions that the new State laws purport to control—such as whether to hire, retain, promote or fire school employees based on their criminal background checks—are Heartland's alone to make.

The statute and enabling regulations presume to determine who "is eligible or ineligible

---

[15] *See* 13 CSR 35-71.015(1); 210.1263, RSMo; 210.493, RSMo.

for employment or presence at the residential care facility." § 210.493.10, RSMo, based upon the results of invasive background checks, but Plaintiff has the constitutional, absolute right to select its ministers despite anything that may show in background checks. The new statute and enabling regulations contain no exception, as required by *Hosanna-Tabor*, for the employment of ministerial employees, including teachers, house parents and the many other employees of Heartland who promote its religious message.

For these reasons, Defendant has violated, and continues to violate, Plaintiff's freedom and autonomy under the Free Exercise and Establishment Clauses.

## VI.   Plaintiff is entitled to summary judgment on its claim that the State's new child removal and medical record laws violate Heartland's Fourth Amendment rights (Count VI).

Plaintiff alleges that Defendant's new rules and regulations expressly allow the State to conduct warrantless and unreasonable searches and seizures. Doc. 23 ¶155. As discussed *supra*, the new laws allow Defendant to conduct child removals, which are seizures, without due process of law. *See supra* Part III.A.

The new laws present other Fourth Amendment problems. Regulations require CNSIMI to keep medical records for children, and allow the Department of Social Services, without any substantive reason and without a warrant, "to inspect the medical records." 13 CSR 35-71.300(5)(D)(8). Similarly, the Department of Social Services can at any time demand:

a full census and demographic information of children at the residential care facility, including parental or other guardian contact information and a full list of officers, managers, contractors, volunteers with access to children, employees, and other support staff of the residential care facility; any person eighteen years of age or older who resides at or on the property of the residential care facility; and any person who has unsupervised contact with a resident of the residential care facility.

§ 210.1264, RSMo. These laws allow warrantless searches in further violation of the Fourth Amendment, and the failure by CNSIMI to concede to these unconstitutional demands is grounds

for closure of CNSIMI. § 210.1271(1), RSMo.

Given the clarity of the new laws' requirements and no disavowal of enforcement by Defendant, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (citing absence of disavowal as support for a credible threat of enforcement), Plaintiff does not have to wait to protect its constitutional rights until it faces a state injunction suit or closure of CNSIMI's business. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat").

Further, in cases where the challenged law is "recent and not moribund," like the laws at issue here, the standard for showing a credible threat of enforcement is "quite forgiving." *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301-02 (1979)). This is because a court presumes that a legislature enacts a statute with the intent that it be enforced. *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021), as amended (June 23, 2021).[16]

## VII. Plaintiff is entitled to summary judgment on its claim that the State's new background check laws violate procedural due process rights as demonstrated in similar federal laws (Count VII).

Section 210.493, RSMo requires a "background check," including a "Federal Bureau of Investigation fingerprint check," for virtually everyone formally associated with CNSIMI. 13 CSR 35-71.015(2). These background checks are required for persons regardless of whether they typically (or ever) have contact with children at the facility. Checks are required for "support staff," for instance, which includes "include any individual who works for or performs services,

---

[16] The Supreme Court "has applied [the principles in *Babbitt*] in a number of cases challenging criminal statutes . . . and in the civil context as well." *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (internal quotation marks omitted) (citing *MedImmune*, 549 U.S. at 129-30 (concluding that plaintiff need not expose itself to civil liability by breaching royalty agreement)); *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000).

including professional services, for the LERCF . . ." 13 CSR 35-71.015. "Professional services"
would appear to include accountants and lawyers and others that have no contact with children at
the facility. *Compare* 34 U.S.C. 40102 (a "background check [is] for the purpose of determining
whether a covered individual has been convicted of a crime that bears upon the covered
individual's fitness *to have responsibility for the safety and well-being of children*") (emphasis
added).

Pursuant to Section 210.493.10 RSMo, an individual is determined to be "eligible or
ineligible for employment or presence at the residential care facility" based upon these FBI
database searches alone. Failure to successfully complete a background check renders an
individual "ineligible for employment or service" at the facility. 13 CSR 35-71.015 (4)(A); Cf. §
210.493.10, RSMo. Section 210.1283, RSMo, also makes it a class B misdemeanor to knowingly
fail to complete a background check as required under § 210.493, RSMo. In other words, it
criminalizes individuals for not waiving their privacy rights. Missouri allows an individual to
appeal a disqualification based on a background check, but, notably, the individual "shall not be
[given] an opportunity to collaterally attack or re-litigate the validity of the underlying plea of
guilt, plea of nolo contendere, or the underlying finding of child abuse, neglect or maltreatment .
. ." 13 CSR 35-71.015(12)(C)(8).

Federal law, on the other hand, requires due process regarding FBI background checks,
including the ability to correct a record:

> The officials making the determination of suitability for licensing or employment shall
> provide the applicants the opportunity to complete, or challenge the accuracy of, the
> information contained in the FBI identification record. . . . **Officials making such**
> **determinations should not deny the license or employment based on information in the**
> **record until the applicant has been afforded a reasonable time to correct or complete**
> **the record, or has declined to do so.**

28 CFR 50.12 (emphasis added).

Thus, under federal law an individual can collaterally attack what is in the database and cannot be told that he or she is ineligible for employment until that right has been exhausted. The individual must be afforded pre-deprivation due process. Under this new Missouri law, he or she is specifically deprived of employment and pre-deprivation due process. This statutory scheme does not afford due process to Plaintiff or others engaged in the activities of Plaintiff's association. The proper due process is recognized by federal background check law, described above, which supersedes the contrary state law that Missouri has set forth. U.S. Const. Art. VI, cl. 2.

## VIII.  Plaintiff Satisfies the Remaining Factors for a Permanent Injunction.

As noted above, to obtain a permanent injunction, a plaintiff is required to show: (1) success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest. *Cmty. Of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011). Plaintiff has more than satisfied this standard.

The State's new laws are legally defective for all of the reasons enumerated in this memorandum; thus, Plaintiff is entitled to prevail on the merits.

The State's new laws violate Heartland's right to expressive association, and "[l]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When a constitutional right is impaired, a finding of irreparable injury is mandatory. *See id*.

There is no evidence whatsoever that anyone would be harmed by the invalidation of the new State laws as applied to Heartland. To Heartland's knowledge, there is no listing in Missouri's Central Registry for Abuse and Neglect that has resulted from any incident between

an adult and a child in the boys' or girls' recovery program in the past 20 years, and no felony or misdemeanor convictions resulting from such interactions in the entire history of Heartland, going back to its beginning in the mid-1990s. Children in the Heartland Children and Youth Home are supervised by carefully vetted staff. SUMF at ¶22. Therefore, the existing harms to Plaintiff vastly outweigh any possible harms to others.

Finally, there is no question where the public interest lies. The new laws do not remedy any actual problem, but they do violate the federal constitutional rights of Plaintiff, its students, and its students' parents. There can be no public interest in a continued violation of those rights and, as such, an injunction against enforcement of the new laws will not negatively impact the interests of the public. "[N]either the government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003).

## CONCLUSION

WHEREFORE, for the reasons stated herein and in all the pleadings, motions, briefs, declarations and exhibits filed herewith, all of which are incorporated herein, Plaintiff respectfully requests that the Court enter summary judgment in its favor and against Robert Knodell, Acting Director of the Missouri Department of Social Services, as set forth in the accompanying Motion of Plaintiff for Summary Judgment.

Respectfully submitted,

OTTSEN, LEGGAT AND BELZ, L.C.


By:  /s/ Timothy Belz
     Timothy Belz  #MO-31808
     112 South Hanley, Second Floor
     St. Louis, Missouri 63105-3418
     Phone: (314) 726-2800
     Facsimile: (314) 863-3821
     tbelz@olblaw.com

     and

     Brad L. Blake #MO-38340
     Fellows & Blake, L.L.C.
     13421 Manchester Road, Suite 105
     St. Louis, Missouri 63131
     Phone: (314) 725-1600
     Facsimile: (314) 725-1609
     bblake@fellowsblakelaw.com

     Attorneys for CNS International Ministries, Inc.


## Certificate of Service

The undersigned hereby certifies that the foregoing document was served on all registered parties on this 7th day of November, 2022, using the Court's online filing system.


     /s/ Timothy Belz